WIGGINTON, Judge.
Appellant brings this appeal from the Department of Health and Rehabilitative Services’ final order denying appellant’s request for a Medicaid interim rate increase. We reverse.
Appellant, lessees and operators of a nursing home facility requested the rate increase following negotiations with the owners of the premises resulting in an increased lease cost and an extension of the lease term. Significant to the department was the fact that the negotiations and resultant amendment of the lease occurred approximately three years prior to the expiration of the original lease agreement.
In the findings of fact section of her recommended order, the hearing officer explained that appellant, as a participant in the Florida Medicaid Program,[1] is entitled to reimbursement of costs incurred by it in *652 the care of Medicaid recipients. The hearing officer specifically found:
11. A provider’s reimbursement rate is determined by HRS from a cost report submitted by a provider. The rate is a prospective per diem rate. If, during the prospective period, the provider incurs an increase in costs, the provider has a right to submit an interim rate request to HRS. The Department uses the same principles to determine whether costs submitted in an interim rate request should be allowed as in determining whether costs submitted in a cost report should be allowed. Lease payments are allowable expenses under the Medicaid program subject to the Medicaid cost reimbursement principles.
12. In calculating Hallandale’s per diem rate, HRS allowed Hallandale $84 per month lease cost for each Medicaid patient in the facility based on the 1971 lease. Prior to executing the new lease, Hallandale contacted HRS to inquire if the new lease cost would be allowable and was informed that the new costs would probably not be allowable. On November 9, 1983, Hallandale submitted an interim rate request to cover the increased cost of the new lease payments. The interim rate request was procedurally correct. By letter dated May 30, 1984, HRS denied the interim rate request because “... the lease cost was negotiated for investment related reasons and is not related to patient care.” On June 28, 1984, Hallandale filed its petition for formal administrative hearing.
(Emphasis added.)
However, significant to the issues raised on appeal[2] were the hearing officer’s further findings of fact, as follow:
6. Hallandale’s determination to renegotiate the lease in 1983 was a reasonable and prudent business decision. By agreeing to increased rental payments for the three years that remained on the original lease, Hallandale gained an additional 12 years to operate the facility. This permitted Hallandale to project its costs and plan for the future. It could make additions and improvements to the building, buy new equipment, and provide for stability in staffing. On the other hand, had Hallandale refused to renegotiate the lease, it faced an uncertain future. There was a strong possibility that the owners would not be willing to renew the lease when it expired, which would result in Hallandale’s losing the equipment and improvements it had put into the building. In addition, the owners were threatening to sell the property, and even though Hallandale had the right of first refusal, it would have had difficulty in obtaining the money required to purchase the property. Further, Hallandale realized that even if the owners would be willing to negotiate a new lease in 1986, Hallandale would not have the same leverage or bargaining power in 1986 as it had in 1983....
7. ... Although the agreement with HRS allows a provider to leave the Medicaid program with 30 days notice, Hallandale has no intention to ever discontinue participation in the Medicaid program.
8. The extended term of the renegotiated lease is not only advantageous to Hallandale, it is also beneficial to Hal-landale’s patients, including Medicaid patients. It secures continuity of care for the patients and ensures that the patients will not have to be moved to a new facility in 1986. The transfer from one facility to another can be a very traumatic event for an elderly person; some patients have died within weeks of *653 a transfer. Further, the patients benefit immediately because the extended term of the lease allows Hallandale to make improvements to the facility and buy equipment that it would not have been able to do without the security of a long term lease.
9. The lease payments called for by the new lease are not out of line with lease payments made by similar institutions. Mr. Lerner looked at other lease payments being made in the community and found that $110 per bed per month was not an exorbitant amount. James Beymer leased nursing home facilities that were not as nice as the Hallandale facility for $138 per bed per month, $166 per bed per month, and $225 per bed per month. Had Hallandale purchased the facility for $3 million, the price asked by the owners, the cost per month per bed would have been over twice the amount of the lease payment.
10. Lease payments are included in a facility’s “fixed costs.”
(Footnotes omitted.) (Emphasis added.)
In her conclusions of law section, the hearing officer prefaced her analysis with a discussion of the applicable law. She noted the following:
Reimbursement rates are established in accordance with the Florida Title XIX Long Term Care Reimbursement Plan (The Plan). See, Rule 10C-7.48(4)(a)5.a„ Florida Administrative Code. Section III. C. of the Plan provides:
Implicit in any definition of allowable costs is that those costs should not exceed what a prudent and cost-conscious buyer pays for a given service or item. If costs are determined by HRS, utilizing the Title XVIII principles of reimbursement, HIM-15, and this plan, to exceed the level that a prudent buyer would incur, then the excess costs will not be reimbursable under the plan.
In determining whether a specific cost is allowable, HRS applies the principles set forth in the Plan and in HIM-15, the Provider Reimbursement Manual of the United State [sic] Department of Health and Human Services. The applicable sections of HIM-15 regarding the reimbursement of provider costs are sections 2100 and 2102. Those sections provide:
2100. PRINCIPLE
All payments to providers of services must be based on the “reasonable cost” of services covered under title XVIII of the Act and related to the care of beneficiaries. Reasonable cost includes all necessary and proper costs incurred in rendering the services, subject to principles relating to specific items of revenue and cost.
2102. DEFINITIONS
2102.1 Reasonable Costs. — Reasonable costs of any services are determined in accordance with regulations establishing the method or methods to be used, and the items to be included. Reasonable cost takes into account both direct and indirect costs of providers of services, including normal standby costs. The objective is that under the methods of determining costs, the costs with respect to individuals covered by the program will not be borne by others not so covered, and the costs with respect to individuals not so covered will not be borne by the program.
[[Image here]]
Implicit in the intention that actual costs be paid to the extent they are reasonable, is the expectation that the provider seeks to minimize its costs and that its actual costs do not exceed what a prudent and cost-conscious buyer pays for a given item or service (see section 2103). If costs are determined to exceed the level that such buyers incur, in the absence of clear evidence that the higher costs were unavoidable, the excess costs are not reimbursable under the program.
2102.2 Costs Related to Patient Care. —These include all necessary and proper costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. Necessary and proper *654 costs related to patient care are usually costs which are common and accepted occurrences in the field' of the provider’s activity. They include costs such as depreciation, interest expenses, nursing costs, maintenance costs, administrative costs, costs of employee pension plans, normal standby costs, and others. Allowability of costs is subject to the regulations and prescribing the treatment of specific items under the Medicare Program.
2102.3 Costs Not Related to Patient Care. — Costs not related to patient care are costs which are not appropriate or necessary and proper in developing and maintaining the operation of patient care facilities and activities. Such costs are not allowable in computing reimbursable costs. They include, for example, costs of meals sold to visitors; costs of drugs sold to other than patients; cost of operation of a gift shop; and similar items.
Based on the foregoing and her findings of fact, the hearing officer concluded:
There is no question that a lease payment is a cost related to patient care as defined by section 2102.2. It is elemental that in a leased facility the cost of the lease is an integral part of the cost of patient care: in a nursing home it provides the “home”. Since there is nothing in section 2102.3 to suggest that a lease payment should be considered a cost not related to patient care, the obvious conclusion is that the cost of a lease is a cost related to patient care. In fact, the prior lease payment had always been an allowable cost and thus determined to be related to patient care. However, because Hallandale renegotiated its lease prior to its expiration, HRS determined that the “increase” in the lease payment was not related to patient care. This view is too narrow; the “increase” is part of the lease payment itself. A lease payment does not change its essential character from being related to patient care to being unrelated to patient care merely because the amount paid for the lease increases.
Since she established that lease costs are related to patient care, the hearing officer considered the true issue to be whether the increased lease payment was reasonable. Under the circumstances of the case, she concluded that it was reasonable.
However, in its final order, despite its specifically adopting the hearing officer’s findings of fact, and notwithstanding its holding that “a lease payment is a cost related to patient care as defined by Section 2102.2,” the department nonetheless concluded that the “ ‘increase ’ ” (emphasis added) in the lease payment was “not necessary or related to patient care.” In so holding, the department made reference to the hearing officer’s finding of fact in paragraph 6, supra, but paraphrased it as finding that appellant’s decision to negotiate a new lease prior to the expiration of the old lease “was purely a business decision to protect the interests of the owners in the facility.” (Emphasis added.) However, a reading of paragraph 6 clearly shows that the department misapprehended the findings of fact in that paragraph. Contrary to the department’s position, the finding in paragraph 6 was that appellant’s determination to renegotiate the lease was a “reasonable and prudent business decision,” and, in paragraph 8, one “beneficial to Hal-landale’s patients, including Medicaid patients.” Again, we stress the fact that the department adopted those findings.
Further, despite its also adopting the hearing officer’s finding that appellant had no intention to discontinue its participation in the Medicaid program, the department held that fact to be irrelevant since it found that appellant has no legal duty to stay in the program longer than thirty days. Instead, the department maintained its firm position that “[tjhere was no showing that the renegotiation of the lease prior to its expiration was necessary or related to patient care,” and that “[tjhere was no showing that the higher costs incurred in increasing the lease payments were unavoidable.”
*655 We must disagree with the department’s position. The issue below was not so much one infused with agency policy, cf. Department of Professional Regulation v. Wagner, 405 So.2d 471 (Fla.1981), as it was fundamentally one of fact. In that regard, it is determinative that the department adopted in toto, without reservation or condition, the hearing officer’s findings of fact. Having done so, it was illogical for the department to reach a conclusion contrary to that of the hearing officer.
Accordingly, we hold that the department erred in rejecting the hearing officer’s conclusions of law, and therefore reverse on Points I — III. As to Point IV, we hold the issue to be without merit by virtue of appellant’s president’s testimony that the increased cost of the new lease has not been passed on to non-Medicaid patients. Thus, the final order is reversed, and the cause remanded with the direction that the department adopt the hearing officer’s recommended order.
REVERSED and REMANDED.
SMITH and THOMPSON, JJ„ concur.

. See section 409.266, Florida Statutes (1985), which provides that the department is responsible for the administration of Medicaid funds under Title XIX of the federal Social Security Act.

. Appellant raised the following points on appeal: I. Whether the Secretary's final order erroneously interprets sections 2102.1 and 2102.2, HIM-15; II. Whether the conclusions of law in the final order are not substantiated by the findings of fact; III. Whether there is substantial competent evidence to support the fact that the renegotiated lease was a necessary and proper cost related to patient care pursuant to section 2102.2, HIM-15; and IV. Whether section 2102.1, HIM-15, providing that reasonable costs covered by the Medicaid program will be reimbursed under the Medicaid program, and not borne by residents not covered by the Medicaid program, was violated by the Secretary’s final order.